***********
Upon review of all of the competent evidence of record with references to the errors assigned and finding no good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, the Full Commission AFFIRMS with some modifications the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by parties as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the Workers' Compensation Act.
2. An employment relationship existed between employee-plaintiff and employer-defendant on or about December 5, 2000.
3. The North Carolina Department of Correction is a duly qualified self-insured with Key Risk Management Services acting as the third party administrator.
4. Pursuant to the Form 21 Agreement, employee-plaintiff's average weekly wage is $461.67.
5. The plaintiff suffered a compensable injury by accident in the course of his employment with defendant on December 5, 2000.
6. Defendant admits that on said date plaintiff injured his right shoulder. However, defendant denies any further injury to plaintiff as a result of the December 5, 2000 injury by accident.
7. Defendant has paid all medical bills and compensation due to plaintiff for the right shoulder injury pursuant to a Form 21 entered into on April 28, 2002.
8. In addition to his admittedly compensable right shoulder injury, plaintiff alleges injury to his left shoulder and neck as a result of his December 5, 2000 injury by accident. The injuries to plaintiff's left shoulder and neck are denied by defendant.
In addition, the parties stipulated into evidence the following:
1. Packet of medical records and reports consisting of 293 pages.
2. Packet of Industrial Commission forms.
3. Transcript of a recorded statement taken on March 21, 2001.
The Pre-Trial Agreement dated September 19, 2003, which was submitted by the parties, is incorporated by reference.
 ***********
Based upon all of the competent evidence of record the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff, who was forty-four years old at the time of the hearing before the Deputy Commissioner, began working for defendant in June 2000 as a correctional officer at Piedmont Correctional Center. His job involved providing security and communicating with inmates at the prison. In December 2000 he was still in the training process for his job and was participating in a self-defense training course. The course included training in the use of firearms, as well as unarmed self-defense maneuvers.
2. On or about December 5, 2000 while participating in the course, plaintiff sustained a compensable injury by accident. He was playing the role of a subject being handcuffed and was lying on his stomach while another officer was pulling his arms behind his back. When the other officer pulled his right arm back to put the handcuff on it, his right shoulder popped and immediately became painful. Although plaintiff told others in the class about the injury, he did not report the injury to his supervisor at the time because he had completed a significant portion of the course. Plaintiff was afraid that he would be taken out of the course and would later have to go back through the entire program with no credit for what he had already completed.
3. On December 6, 2000 plaintiff went to the local Veterans Administration (VA) Hospital, advised that he had injured his right arm approximately ten days previously with a hyperextension injury which had caused a pop in his shoulder, and further indicated that he was experiencing a burning sensation down his arm. To the extent that the handwritten medical reports were legible, it appeared that he was diagnosed with right shoulder bursitis and that the doctor prescribed medication and a sling for him. Plaintiff was later referred to physical therapy and in February 2001 mentioned to the physical therapist that he had a second job installing fences. Plaintiff further indicated that he had tried to swing a sledgehammer in that job and could not do it due to right arm pain. His symptoms persisted despite medication and physical therapy. In fact, plaintiff began taking twice as many narcotic tablets as he had been instructed to take. Yet he did not report the injury to defendant until approximately early March 2001. Despite the late notice of the injury, defendant admitted liability for his right shoulder injury pursuant to a Form 21 agreement which was subsequently approved by the Industrial Commission.
4. Plaintiff then received treatment by Dr. Stephen Furr, an orthopedic surgeon, who first examined him on March 22, 2001. Plaintiff described the injury and persistent pain which was on the outside and front of his right shoulder. It appeared that plaintiff's injury was just to his right shoulder, but Dr. Furr ordered an x-ray of his neck in order to make sure that there were no obvious problems there. The x-ray was negative. Consequently, the doctor ordered an MRI of the shoulder. The test revealed abnormalities consistent with an anterior labral tear, which was a defect of the cartilage in the anterior portion of the joint, a condition which was consistent with the handcuffing incident. Dr. Furr recommended surgery, and on April 25, 2001 he performed a "SLAP" repair of the shoulder.
5. Following the operation, Dr. Furr treated plaintiff with medication, physical therapy and trigger point injections. However, plaintiff continued to complain of such serious pain that the doctor prescribed narcotic pain medicine. Unknown to Dr. Furr, plaintiff was also going to the VA Hospital that summer to get additional narcotic pain medicine.
6. In August 2001 the nurse case manager assigned to the claim informed Dr. Furr that plaintiff canceled his recently ordered physical therapy because his pain had significantly improved after his shoulder popped at work. A month later, however, plaintiff was having pain in the biceps area, so Dr. Furr ordered an arthrogram/MRI. Plaintiff was then referred to Dr. Walton Curl, an orthopedic surgeon at Wake Forest University Baptist Medical Center, for another opinion.
7. Before plaintiff saw Dr. Curl, he was involved in a motor vehicle accident in which the vehicle he was driving rear-ended another vehicle at a relatively slow speed. Following the collision, plaintiff was taken by ambulance on a backboard to the hospital emergency room where he complained of neck and back pain, with his pain reportedly at a level of 7 out of a possible 10. On examination, plaintiff had no acute findings, so he was given medication and discharged. He apparently did not describe the motor vehicle accident to Dr. Curl when he was examined on October 29, 2001. Dr. Curl reviewed the diagnostic tests and was of the opinion that the labral lesion in the shoulder was resolved. It was his impression that plaintiff had right biceps tendinitis and irritation of the right acromioclavicular joint, a condition which Dr. Furr had previously advised plaintiff was not likely a result of the injury at work.
8. Dr. Curl recommended arthroscopic surgery, which was performed on November 13, 2001. During the operation, no biceps tendinitis was found, but there was extensive bursitis in the joint which was debrided. Plaintiff was subsequently referred to physical therapy. On December 4, 2001 the physical therapist noted that plaintiff reported significant improvement in his symptoms, including resolution of his right hand pain, although he did continue to have some occasional shoulder pain and occasional sharp pain radiating down his arm. Dr. Curl released plaintiff to return to work on January 7, 2002 with a restriction against shotgun duty.
9. On January 30, 2002 plaintiff went to the VA Hospital and mentioned that he was then having the same pain in his left shoulder as he had had in his right shoulder. He stated that he had no trauma to precipitate the symptoms. Earlier that month, plaintiff complained of similar problems to the nurse case manager, and in February 2002 he also complained of left shoulder pain to the physical therapist who was treating him for his right shoulder. When he last saw Dr. Curl on March 11, 2002, he told the doctor that he had had problems with his left shoulder since his injury and that the pain had worsened from favoring his right arm. Dr.Curl injected both of plaintiff's shoulders on that occasion, released him from medical care and allowed him to perform full duty work.
10. Plaintiff did not receive medical care again for his shoulder problems until July 16, 2002 when he returned to Dr. Furr. On that occasion, plaintiff had the additional complaint of neck pain as well as left shoulder pain. Dr. Furr ordered several diagnostic tests, but defendant would not authorize any testing but the MRI to the right shoulder. When plaintiff returned to the doctor on August 28, 2002, Dr. Furr reviewed the shoulder MRI, which showed some fluid in the subacromial bursa. He subsequently injected both shoulders. Plaintiff finally had the cervical spine MRI performed on his own, and the test revealed significant narrowing of the spinal canal. Consequently, Dr. Furr decided not to treat the shoulders further until the cervical spine condition was treated. He referred plaintiff to Dr. Mark Lyerly, a neurosurgeon, for evaluation.
11. Dr. Lyerly examined plaintiff on September 27, 2002. On examination, there were signs of motor neuron dysfunction, and review of the MRI films revealed critical canal stenosis at C5-6 and significant canal stenosis at C4-5 and C6-7. Due to the seriousness of the findings, Dr. Lyerly recommended prompt surgery since plaintiff was at risk for catastrophic injury should he be involved in an accident of some sort. Consequently, on October 18, 2002 Dr. Lyerly operated on plaintiff's neck to decompress and fuse the affected levels of his cervical spine. After the operation, the findings on neurologic testing improved, as did plaintiff's pain, but a subsequent MRI indicated that he had sustained some permanent damage to his spinal cord due to the compression from the stenosis. Dr. Lyerly released plaintiff to return to work effective December 12, 2002 with no use of firearms and continued to follow his recovery until at least June 2003.
12. Plaintiff claimed that his left shoulder and cervical spine conditions were a proximate result of the handcuffing incident at work on December 5, 2000. For the reasons described, his allegation has not been accepted as credible. His first recorded report of injury was to the staff at the VA Hospital who noted a history of a hyperextension injury to the right arm with a pop in the right shoulder. Plaintiff did not report an injury to his employer until approximately three months after it occurred, which put defendant at a disadvantage for investigating the claim when he later claimed additional injuries. In an extensive recorded statement taken March 21, 2001, plaintiff described only a right shoulder injury. The subsequent diagnostic tests and surgery performed to the right shoulder by Dr. Furr revealed specific pathology consistent with the injury described by plaintiff.
13. Although in March 2001 plaintiff described to the VA physical therapist some aching of the left shoulder while sleeping, he did not relate those symptoms to the handcuffing incident. Furthermore, contrary to his testimony, plaintiff had a second job where he installed fences, a job which required swinging a sledgehammer to drive in the fence posts. This type of activity could cause shoulder problems. There were no further left shoulder complaints from March 2001 until January 2002 when he began to complain of similar pain in his left shoulder as he had had in his right shoulder. These symptoms occurred over a year after the handcuffing incident and plaintiff did not relate the symptoms to trauma.
14. Since plaintiff was less than truthful about his activities away from work, since he had a fence installation business which could have affected his shoulders, since he did not relate his left shoulder symptoms, which were minor, to his injury at work, since he did not report a left shoulder injury to his employer and since his testimony that he experienced left shoulder pain continuously after the injury was not accepted as credible, the left shoulder symptoms for which he was subsequently treated were not proven to have been a proximate result of the injury giving rise to this claim.
15. The spinal stenosis in plaintiff's cervical spine preexisted the handcuffing incident. It was a congenital and degenerative condition which was long-standing. Despite the fact that such a problem could potentially cause right shoulder and arm symptoms due to nerve impingement and despite Dr. Furr's opinion regarding the causation issues, the cervical spine stenosis was not caused by the compensable injury and was not proven to have been materially aggravated by the injury at work.
16. Plaintiff did not complain of neck problems in the months following his injury. His first complaint of neck problems occurred when he was involved in a motor vehicle accident in October 2001, almost a year after his handcuffing incident. Although he testified that the motor vehicle accident was very minor and did not change his symptoms, the symptoms following the accident were serious enough that plaintiff was taken from the accident scene to the hospital by ambulance and he complained of serious neck and back pain at the hospital. Consequently, his testimony regarding the effects of the accident has not been accepted as credible. Plaintiff gave an inaccurate history to Dr. Lyerly which was similar to his testimony. The hypothetical question presented to the doctor was also materially inaccurate. Dr. Lyerly explained that his testimony regarding the causation issue was dependent upon the accuracy of the facts and that his opinion would be modified if the facts were different than those presented.
17. In view of the credibility problems, the intervening injury and the lack of clearly neck-related symptoms following the injury and given the facts that the spinal stenosis was a preexisting condition, a specific right shoulder pathology was identified which was consistent with the handcuffing incident and which explained his symptoms, and Dr. Lylery based his causation opinion on an inaccurate history, plaintiff did not prove by the greater weight of the evidence that his preexisting cervical spinal stenosis was materially aggravated by the injury by accident giving rise to this claim.
18. Defendant admitted liability only for the right arm condition. Defendant has paid compensation to plaintiff for temporary total disability and for a twenty percent permanent partial disability rating to that arm. No evidence was presented indicating that plaintiff sustained a material change of condition with respect to his right shoulder condition. However, Dr. Furr was continuing to treat him symptomatically as of September 2003 and thought that further surgery might ultimately be necessary. Consequently, it appears that future treatment will be likely for the right shoulder and that the treatment will tend to effect a cure, give relief or lessen plaintiff's disability.
 ***********
Based on the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff is not entitled to benefits under the Workers' Compensation Act for his left shoulder condition and the spinal stenosis of his cervical spine, which conditions were not proven to have been causally related to the compensable injury by accident giving rise to this claim. N.C. Gen Stat. § 97-2(6); Click v. Freight Carriers,300 N.C. 164, 265 S.E.2d 389 (1980); Anderson v. Motor Co., 233 N.C. 372,64 S.E.2d 265 (1951).
2. Plaintiff is entitled to necessary future treatment for his compensable right shoulder condition to the extent that the treatment will tend to effect a cure, give relief or lessen his disability. N.C. Gen Stat. §§ 97-2(19); 97-25, 97-25.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
 AWARD
1. Plaintiff's claim for workers' compensation benefits for his left shoulder condition and the spinal stenosis of his cervical spine is hereby DENIED.
2. Defendant shall pay all medical expenses incurred by plaintiff as a result of the injury by accident to his right shoulder to the extent that he requires treatment, which will tend to effect a cure, give relief or lessen his disability.
3. Defendant shall pay the costs.
This the 23rd day of November 2004.
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
CONCURRING:
 S/____________ BUCK LATTIMORE CHAIRMAN
 S/_____________ PAMELA T. YOUNG COMMISSIONER
LKM/mlb